IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CYNTHIA HULL, | |
| Plaintiff, | 4:12-CV-3224 |
| vs. | |
| NORTHEAST LEGAL GROUP, LLC., | MEMORANDUM AND ORDER |
| Defendant. | |

On April 9, 2013, the Court granted plaintiff Cynthia Hull's motion for default judgment against defendant Northeast Legal Group, LLC. (Northeast). Filings 11 and 13. At that time, the Court found that Hull had established several violations by Northeast of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq*. Hull seeks statutory damages of $1,000 and $3,250 in actual damages as compensation for emotional distress, as well as an award of costs and attorney fees. *See* § 1692k(a). The Court did not enter judgment at that time, but set a hearing to determine the appropriate amount of damages. At a hearing held on May 24, 2013, the Court received evidence and heard testimony from Hull. Northeast failed to appear. Having carefully considered the record, and giving due deference to awards in comparable cases, the Court finds that an award of $1,000 in statutory damages is appropriate, and $500 in actual damages. The Court will also award attorney fees of $4,645.50, and taxable costs of $400.

## BACKGROUND

The debt at issue was originally owed to a local grocery store, and arose from two checks that had been declined for insufficient funds in 2008.[1] Filing 1 at 1–2; filing 18. At that time, the "bill pay" feature of Hull's bank account was not working properly, which resulted, on several occasions, in her account being overdrawn. Fed up with the bank, she closed the account. Filing 18. At some point, Global Payments Check Services, Inc. (Global), purchased or otherwise acquired the debt. Filing 1 at 2.

---

[1] The Court set forth the relevant facts of this case in its previous order (filing 13). The factual background of this case was fleshed out more fully by Hull's testimony at the hearing held on May 24, 2013. Filings 1; 12-1; filing 18.

In 2012, Hull was attending college to obtain a master's degree in managerial communications. Hull's employer had encouraged her to obtain the degree and was considering her for a management position. She was required to send her employer updates regarding her educational progress, and in return Hull received tuition reimbursement. Filing 18. In June 2012, Hull applied for financial aid for the 2012-2013 school year. On June 17, she received a notice that her application had been denied. After contacting financial aid officials, Hull learned that her credit reports showed four accounts being reported as past due for over 90 days. Hull testified that this was the first she had heard of these debts, and that she thought she had cleared all of this up when she had closed her old checking account. This placed Hull in a bind: she could not afford school without financial aid, and the financial aid officers told her she needed to provide proof the accounts had been paid in full and closed out. Filing 18.

Hull telephoned Global, and it informed her that she owed a total of $372. Filing 12-1 at 2; filing 18. This consisted of two checks that had been declined, for $196 and $96, and collection fees assessed by Global of $40 on each amount. Filing 12-1 at 2. Global also told Hull it had referred the account to Northeast for collection, and provided Northeast's phone number. Filing 12-1 at 2.

When Hull called Northeast, the employee she spoke with informed her that her debt consisted of one debt of $296 and another for $396. Filing 12-1 at 2–3. Hull responded that she believed she owed less, and asked for documentation to validate the amounts claimed by Northeast. Filing 12-1 at 3. The Northeast employee refused to provide such documentation, on the grounds that Hull had already contacted Global and her bank regarding the debt. Filing 1 at 5; filing 12-1 at 3; filing 18. The employee also told Hull that unless she made a payment, Global would continue to charge fees. Filing 12-1 at 3. Hull agreed to pay $100 on that day. Filing 18.

Now confused as to what amount she actually owed, Hull called Global again. Filing 12-1 at 3. Global confirmed that the total amount she owed was, in fact, $372. Filing 12-1 at 3. Global also stated that (contrary to what Hull had heard from Northeast) it was not charging any additional fees. Filing 12-1 at 3. Around this time, Hull also examined her credit report, and noticed that in addition to the debt totaling $372 that was being reported by Global, Northeast was also reporting debts of $246 and $346, making it appear that she owed more, and on more accounts, than she actually did. Filing 12-1 at 3–4.

Over the following months, Hull attempted to deal solely with Global, because she could not afford to pay the amount Northeast was requesting (and which was more than she actually owed). Global told Hull to continue

dealing with Northeast. After many calls to Global, Hull eventually reached an employee who allowed her to make the payment directly to Global. Hull obtained proof of this payment and was ultimately able to obtain financial aid and re-enroll in school. Hull had to make many of these calls while at work, and had to leave at least one work meeting to take a return call. She testified that when she made these calls, she had to use the glass-walled conference room near her cubicle, and that she was embarrassed because it appeared she was frequently leaving her desk to take personal calls. Filing 18.

Hull testified that this 3-month ordeal impacted her work and family life, and caused her anxiety and frustration. Hull is married with two children, and provides the sole income for her household. She was very worried that if she could not clear up the debt in time, she would not be able to finish her degree, which would have deprived her of an opportunity to move forward in her career and, ultimately, would have affected her ability to support her family. Hull testified that this had her in a "panic" and that she felt like she was failing her family. Additionally, the stress of the situation led to arguments with her husband. Filing 18.

## ANALYSIS

The Court previously found that by providing a false statement to Hull of the amount she owed, and falsely stating that Global would continue to assess fees, Northeast violated § 1692e(2)(A), which prohibits false representations as to the character, amount, or legal status of any debt, and § 1692e(10), which prohibits the use of false representations or deceptive means to collect a debt. The Court also found that Northeast violated § 1692g(a), which requires debt collectors, within 5 days after the initial communication with a consumer in connection with the collection of a debt, to provide notice of certain information. The only remaining task is to determine the appropriate amount of damages and attorney fees.

### I. Damages Under the FDCPA

Successful plaintiffs in FDCPA cases may be awarded statutory damages of up to $1,000 per proceeding, § 1692k(a)(2), as well as an amount equal to "any actual damage sustained" by the plaintiff as a result of a violation of the FDCPA. § 1692k(a)(1). This includes damages for emotional distress and embarrassment. *Minnifield v. Johnson & Freedman, LLC*, 448 Fed. Appx. 914, 917 (11th Cir. 2011); *Johnson v. Eaton*, 80 F.3d 148, 152 (5th Cir. 1996); *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1041 (D. Minn. 2010). Although the Eighth Circuit has not addressed this aspect of the FDCPA, it has held that the Fair Credit Report Act (FCRA), 15 U.S.C. § 1681 *et seq.*, which contains a similar provision authorizing an award of

- 3 -

"actual damages" to injured consumers, § 1681n(a)(1)(A), can support an award of damages for emotional distress. *Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 828 (8th Cir. 2013). Other courts have recognized the similarities between the "actual damages" provisions of the FDCPA and the FCRA, and reasoned that similar standards should govern each. *See, e.g.*, *Riley v. Giguiere*, 631 F. Supp. 2d 1295, 1315 (E.D. Cal. 2009); *Healey v. Trans Union LLC*, 2011 WL 1900149 (W.D. Wash. 2011). This Court will likewise turn to decisions interpreting the FCRA for guidance.

Emotional distress damages under the FCRA must be supported by "competent evidence of 'genuine injury,' which 'may be evidenced by one's conduct and observed by others.'" *Taylor*, 710 F.3d at 828 (quoting *Carey v. Piphus*, 435 U.S. 247, 264–65 (1978)). Likewise, under the FDCPA, Hull must present competent evidence of a "genuine" injury. This may be based solely on her own testimony. *Fuller v. Fiber Glass Sys., LP*, 618 F.3d 858, 865 (8th Cir. 2010). In other words, Hull's testimony need not be corroborated by other witnesses or medical records (although such evidence is certainly probative). *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 720 (3d Cir. 2010). But where, as here, the plaintiff's own testimony is her only evidence of emotional damages, she must explain the circumstances of her injury in reasonable detail and not rely on conclusory statements, unless the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action. *Wantz v. Experian Info. Solutions,* 386 F.3d 829, 834 (7th Cir. 2004), *abrogated on other grounds by Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 56 (2007).

In determining the amount of liability for both actual and statutory damages, the FDCPA directs courts to consider, among other relevant factors: the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional. § 1692k(b)(1).

Having considered these factors, the Court finds that an award of $1,000 in statutory damages is warranted in this case. Northeast's violations of the FDCPA were not frequent or persistent. However, the nature of Northeast's noncompliance is sufficient to warrant an award of the maximum amount of statutory damages. Northeast did its best—through deception and its refusal to provide documentation of the debt—to convince Hull to pay nearly twice the amount she actually owed. The Court lacks the evidence to determine if this was an intentional violation of FDCPA or simply the result of incompetence on Northeast's part. Either way, the Court is convinced that trying to collect twice the amount owed, whatever the motivation or means employed, warrants an award of the full $1,000 in statutory damages. *See, e.g.*, *Richardson v. Check Sys. Recovery,* LLC, 2012 WL 6049703 (N.D. Ind.

2012); *cf.*, *Ponce v. BCA Fin. Servs., Inc.*, 467 Fed. Appx. 806 (11th Cir. 2012); *Martinez v. Commercial Recovery Sys., Inc.*, 2013 WL 2237571 (M.D. Fla. 2013). Nor was this the only violation of the FDCPA. Northeast also falsely stated that Global would continue to charge fees, and only provided the notice required by § 1692g(a) when Hull obtained counsel and threatened suit.

The Court further finds that Hull is entitled to $500 in actual damages for emotional distress. While the Court found Hull to be sincere and credible in her testimony, she has not presented proof of the type of severe and concrete emotional distress that would support a larger award. Hull suffered no physical injury and was not treated for any psychological or emotional issues. *Taylor*, 710 F.3d at 829. Hull was not subjected to profanity, repeated threats of legal action, or repeated unwanted calls made to her family or place of employment. *See, e.g.*, *Jenkins v. E. Asset Mgmt., LLC*, 2009 WL 2488029 (E.D. Mo. 2009); *Anderson v. Specified Credit Ass'n, Inc.*, 2011 WL 2414867 (S.D. Ill. 2011). To her credit, Hull handled the stress of this situation relatively well, and while that is commendable, it is not compensable under the FDCPA.

## II. Attorney Fees and Costs

The FDCPA provides that successful plaintiffs are entitled to receive "the costs of the action, together with a reasonable attorney's fee as determined by the court." § 1692k(a)(3). A plaintiff who has obtained an award of statutory or actual damages certainly qualifies as successful; and an award of attorney fees to successful plaintiffs under FDCPA is mandatory. *French v. Corp. Receivables, Inc.*, 489 F.3d 402, 403 (1st Cir. 2007); *see also*, *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1032 (9th Cir. 2012); *Zagorski v. Midwest Billing Servs., Inc.*, 128 F.3d 1164, 1166 (7th Cir. 1997); *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 628–29 (4th Cir. 1995); *Graziano v. Harrison*, 950 F.2d 107, 114 & n.13 (3d Cir. 1991); *Pipiles v. Credit Bureau of Lockport, Inc.,* 886 F.2d 22, 28 (2d Cir.1989); *but cf.*, *Nagle v. Experian Info. Solutions, Inc.*, 297 F.3d 1305, 1307 n.3 (11th Cir. 2002); *Johnson v. Eaton*, 80 F.3d 148, 152 (5th Cir. 1996).

The Court bears the responsibility of scrutinizing attorney fee requests, and the burden rests with counsel to establish a factual basis to support the award. *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *see also Wheeler v. Missouri Highway & Transp. Comm'n*, 348 F.3d 744, 754 (8th Cir. 2003). The Court will utilize the "lodestar" approach to analyze Hull's request for attorney fees. *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 965 (8th Cir. 2012). The Court begins by calculating the lodestar amount, that is, the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Id.* To determine the number of hours

reasonably expended, the Court weighs the hours claimed against its own knowledge, experience, and expertise of the time required to complete similar activities. *Gilbert v. City of Little Rock, Ark.*, 867 F.2d 1063, 1066 (8th Cir. 1989). When determining a reasonable hourly rate, the Court relies on its own experience and knowledge of prevailing market rates. *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005).

After calculating the lodestar, the Court may adjust that amount, up or down, to reflect the individualized characteristics of a given action. *Id.*; *Farmers Co-op Co. v. Senske & Son Transfer Co.*, 572 F.3d 492, 500 (8th Cir. 2009). There are a number of factors the Court may examine to determine if a request for attorney fees is reasonable and whether an upward or downward adjustment from the lodestar amount is warranted. *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 264 n.25 (8th Cir. 1985) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)) (setting forth the twelve "*Johnson*" factors); *see also Hensley v. Eckerhart*, 461 U.S. 424, 434 n.9 (1983) (noting that many of the *Johnson* factors are already subsumed in the lodestar calculation). Of these, the most critical factor is the results counsel has obtained for their client. *Hensley*, 461 U.S. at 434; *Wheeler*, 348 F.3d at 754; *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002).

Hull's counsel has requested fees totaling $4,645.50, for 18.1 hours of work at rates ranging from $115 (a paralegal) to $395 an hour (a managing partner with approximately 20 years' experience). Filing 21-1 at 2; filing 21-3. The Court has reviewed the number of hours and rates and finds both are reasonable. The Court further finds that no upward or downward adjustments based on the *Johnson* factors are warranted. Accordingly,

IT IS ORDERED:

1. Judgment is entered in favor of Hull and against Northeast.

2. Hull shall recover from Northeast the sum of $1,000 as statutory damages, $500 as actual damages, and attorney fees of $4,645.50, with post-judgment interest thereon at the rate provided by 28 U.S.C. § 1961. The Clerk is directed to award costs in this matter.

3. A separate judgment will be entered.

Dated this 31st day of May, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge